# WILLIAM J. READ *vs.* DeWARREN H. REYNOLDS ET AL.

*Hearing on Bill and Answer—Non-Applicability of the Rule Relating to Purchase by Trustee of Trust Property.*

When the plaintiff sets down the cause for hearing upon bill and answer, he thereby admits the truth of every fact set forth in the answer, including averments in avoidance of, as well as those responsive to, the allegations of the bill.

Plaintiff's brother mortgaged property owned by him and loaned the money to plaintiff who promised to pay the mortgage when due. Afterwards plaintiff conveyed all his property to the defendant and others as trustees to pay his creditors. Defendant became the assignee of the said mortgage, and at the foreclosure sale thereof became the purchaser of the property at a sum which satisfied that debt and left a surplus of about $6,000. Plaintiff's bill in this case alleged that, although the property covered by that mortgage was not a part of the trust estate conveyed to the defendant, yet it was so closely connected therewith that a trust should be fastened upon it in the hands of the defendant; that the sale was for an inadequate price, and the bill prayed that defendant's purchase of such trust property be vacated. *Held,* that the purchase of the mortgaged property by the defendant was not the case of a purchase of trust property by the trustee, since it was not embraced in the assignment for the benefit of creditors to the defendant, and he had no duty to perform in relation thereto inconsistent with the character of a purchaser on his own account; that the amount of the trust estate in defendant's hands could not be increased by any increase in the price obtained for the property of plaintiff's brother, and the fact that the latter is now deceased, leaving plaintiff his sole heir, can make no difference because that inheritance is not a part of the trust estate.

Appeal from the Circuit Court for Allegany County (BOYD, C. J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, PEARCE and SCHMUCKER, JJ.

*Wm. J. Read* and *John E. Semmes* (with whom was *Joseph Sprigg* on the brief ), for the appellant.

*Benjamin A. Richmond,* for the appellees.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Allegany County, as a Court of equity, passed in a cause submitted upon bill, answer and exhibits. The case presented is a novel one, and as such has received careful examination, since we recognize the fact that while the science of law, upon which the administration of justice depends, is more rigidly guided and governed by precedent than any other science, it yet should, and does respond to the demand for the application of correct legal principles to the exigencies of new situations.

The bill in this case was filed by William J. Read, and sets forth that on January 22nd, 1896, his brother, Robert C. Read, with their mother, Sarah H. Read, made a mortgage to George Glick to secure a debt of $6,000, due three years after date, contracted by Robert C. Read, for the exclusive benefit of William J. Read, who received the $6,000 for his own use, and promised the said Robert C. Read to pay the said mortgage when due; that Sarah H. Read owned the life estate, and Robert C. Read owned the remainder in the said mortgaged premises, and that Sarah H. Read has since died; that on April 7th, 1897, William J. Read and wife, together with Robert C. Read, made a mortgage to Warren C. White upon all the real estate of William J. Read, and upon the real estate of Robert C. Read previously mortgaged to Glick, to secure a debt of $8,000 due from William J. Read to said White; that on November 5th, 1897, William J. Read and wife conveyed all their property embraced in the White mortgage to DeWarren H. Reynolds, Robert R. Henderson, and James W. Thomas, as trustees, with power to sell the same for the payment of all the debts of William J. Read which included the Glick and White mortgages; that these trustees accepted the trust, sold all said property, and have received all the purchase-money, and have distributed the same under audits duly ratified by the Court; but that instead of paying all the debts of William J. Read as he confidently expected, there is only $2,532.71 to be applied to the White mortgage; that on August 18th, 1897,

the White mortgage was assigned to DeWarren H. Reynolds, and on January 21st, 1899, the Glick mortgage was also assigned to him, and that said Reynolds was a practicing lawyer, and the attorney of William J. Read and Robert C. Read during the whole period covered by these transactions, and procured as their attorney the $8,000 loan from said White, and knew that the $6,000 loan from Glick was for the exclusive use of William J. Read, and that he had promised to pay the same; that after the assignment of the Glick mortgage, and while acting as the attorney for William J. Read, as one of said trustees, and as agent for Robert C. Read, the said Reynolds, acting under a power of sale contained in the Glick mortgage, advertised the mortgaged premises for sale, and himself became the purchaser thereof for the sum of $15,150; that the sale has since been ratified and the property conveyed to Reynolds by Benjamin A. Richmond, the trustee appointed for that purpose, and that Reynolds has since sold and conveyed the same to the Inter-State Trust and Guaranty Company for $16,500; that said company was incorporated by the Legislature of Maryland by ch. 181 of the Acts of Assembly of 1900, and that before and at the execution of said last-mentioned conveyance, said Reynolds was a stockholder, director and president of said company, and was personally cognizant of all the facts alleged in the bill, and that the company therefore had notice thereof; that in the audit of the proceeds of sale under the Glick mortgage, $1,212 was allowed Reynolds as commissions, and after allowance of the costs and the amount of the Glick mortgage, there remained $5,901 which should be distributed as a payment on the White mortgage, but which has never been so credited, and that even if so credited, there would still be a considerable balance for which the plaintiff would be liable to Reynolds as assignee; that said sale was a forced sale for cash, when real estate values in Cumberland was much depressed, and that the sale was for a greatly inadequate price, the property being at that time worth at least $20,000; that sometime before the sale, Reynolds took possession of the property, and collected the rents and profits.

paying therefrom the sum of $40 per month to Sarah H. Read up to the time of her death, and thereafter $30 per month to Robert C. Read, but that no account of said rents and profits was ever rendered to Robert C. Read in his life, and no part thereof was ever applied on either of said mortgages, though the rents were ample to pay the taxes on the property, and the interest on both mortgages, in addition to the payments above mentioned; that Robert C. Read died January 17th, 1903, and · that neither he, nor William J. Read were made parties to the proceeding for sale, nor assented thereto; the bill then charges "that although the property of Robert C. Read conveyed in the Glick mortgage was not a part of the property conveyed by William J. Read and wife to said trustees, yet the said property of Robert C. Read, was, and is, so closely and intimately connected therewith, as that a Court of equity will fasten upon it in the hands of said Reynolds, or his vendee with notice, a trust for the benefit of said William J. Read   *   *   *  , because a sale of Robert C. Read's property embraced in the Glick mortgage, for less than its true value, would diminish the amount to be applied on the White mortgage which was a second lien on the property of Robert C. Read."

The prayer of the bill was, 1st: That the sale by Reynolds to himself be vacated and·set aside, and his conveyance from Mr. Richmond, as trustee, be annulled.    2nd: That the sale from Reynolds to the Trust Company, and his conveyance to it be vacated and annulled. 3rd: That Reynolds be required to return to the Trust Company the purchase-money paid by it.  4th: That he be required to render an account of the rents and profits of the property from the time when he took possession up to the present time; and for such other relief as the case may require.

Lengthy separate answers were filed by both defendants admitting the matters of record alleged in the bill, but specifically denying many of the other·averments.

The answer of Mr. Reynolds denies any knowledge that the Glick mortgage of $6,000 was for the benefit of the plaintiff,

or of his agreement with Robert C. Read to pay it when due; it denies that the deed of trust provided for the payment of the Glick mortgage, and avers that it provided only in the usual terms for payment of the *grantor's debts;* it admits that Reynolds, as attorney for White, negotiated the $8,000 loan and drew the mortgage therefor, but avers that in the transaction he acted only as the friend of Wm. J. Read, and made no charge against him, and received nothing whatever for his services; it denies that he was ever the attorney of William J. Read, since the execution of his deed of trust, and avers that, although various conferences were since held between them, they were all in his capacity as trustee; it denies that he was ever attorney for Robert C. Read in any transaction, or that he knew of the Glick mortgage until sometime after its execution, or that he was attorney for Wm. J. Read when either the Glick or White mortgage was assigned to him, and it avers that the sale made by him under the Glick mortgage was made on a rising land market, for a high figure, and was so regarded at the time by every one; it denies that the trust company had notice of any of the matters alleged in the bill, except those of which the records afforded constructive notice; it denies that the balance, $5,901, mentioned in the bill, is now or ever was, applicable to the White mortgage, because it avers that this sum was audited to him in trust to await the decision of the Court upon petitions of creditors still pending for the marshalling of the proceeds of sale; it admits that he took possession of the mortgaged property of Robert C. Read in August, 1900, being compelled to do so to prevent a sale for taxes and water rent which were in default; that the property was valuable, and under rent, and that he collected the rents, charging nothing for his services, but that he fully accounted for all said rents to Robert C. Read in his lifetime, and that subsequently, upon the application of William J. Read, he had long since given him a statement showing the application of all said rents, a duplicate statement being filed with his answer; it admits that William J. Read was the sole heir of Robert C. Read; it avers that in addition to a compli-

ance with all the requisites of law in making the sale under the Glick mortgage, he personally notified Robert C. Read of the time and place of sale, and that Wm. J. Read knew when and where said sale was to be made, but that neither one attended the sale or paid any attention to the matter, though he denies that the property so sold was in any way a trust property for the benefit of Wm. J. Read, or that he had any right or interest therein; and there is filed with this answer a statement showing the application of the $8,000 loan from White. The answer avers that at the request of both Reads, he paid the interest on the Glick mortgage, and the taxes and water rents on the property, down to January, 1899, when the mortgage was assigned to him, and that in August, 1897, in compliance with his promise to White when the loan was made, he paid the mortgage to White, and took an assignment thereof; that after carrying these burdens for the transactions of other persons, until the winter of 1901, after the death of Sarah H. Read, he determined he could not longer continue them, and made the sale under the Glick mortgage, which was reported without objection from Wm. J. Read or anyone else, and that upon its ratification he made repairs on the property costing over $800, and afterwads sold the same to the trust company for the sum stated in the bill.

The answer further avers that at the time the White loan was made, Wm. J. Read expressed to him his gratitude for what he had done for his accommodation, and insisted upon conveying him a lot of land in Cumberland worth about $100, and which he accepted under Mr. Read's urgency at a nominal consideration of $200 stated in the deed as the value of his services; that later, Wm. J. Read obtained from him loans and endorsements to the amount of about $600, in discharge of which he accepted a conveyance of three other lots in Cumberland, though not worth that amount; that still later he endorsed notes for Wm. J. Read amounting to $800, secured by a mortgage upon a stone crusher, which notes he has since paid, and which are still due to him, and that he is informed and believes that the mortgage he holds on the stone crusher

is of little or no value. The answer of the trust company may be sufficiently described as admitting such averments of the bill as refer to constructive notice of matters of record, and as denying any knowledge of the other allegations of the bill except the purchase by it from Reynolds, of the property in question.

The law is clear that when the plaintiff sets down the case for hearing upon bill and answer, as he may, in so doing he admits the truth of every fact set forth in the answer. *Contee* v. *Dawson*, 2 Bland, 264; *McKim* v. *Odom*, 3 Bland, 407. In such case, the answer is to be considered as true in regard to all matters stated in it which are susceptible of proof by legitimate evidence. *Warren* v. *Twilley*, 10 Md. 39; *Eversole* v. *Maul*, 50 Md. 95. And this is true as well of averments in avoidance of, as of those responsive to, the allegations of the bill. *Royston* v. *Horner*, 75 Md. 557; *Barton* v. *Fraternal Alliance*, 85 Md. 33.

Upon reference to the bill and answers in this case, from which we have extracted at considerable length in this opinion, for the sake of clearness, it will be seen that there is but a single question left open for consideration, and that is, as stated by the appellee in his brief, "whether Mr Reynolds' sale and purchase of the property, under the power in the mortgage, and his subsequent sale of the same to the Inter-State Trust and Guaranty Company were regular and valid, or whether they can now be set aside at the instance of the appellant."

The principle of law which the appellant invokes in his brief is that established in the leading case of *Fox v. Mackreth*, 2 Cox 320, and 2 *Bro. C. C.*, 400. What was decided in that case as stated in the headnote thereto in 1 Leading Cases in Equity, *Hare & Wallace's notes*, p. 72, was this: "A trustee for the sale of estates for payment of debts, who purchased them himself, by taking an undue advantage of the confidence reposed in him by the plaintiff, and previous to the completion of the contract, sold them at a highly advanced price, decreed to be a trustee, as to the sum produced by the second sale, for the original vendor," and in delivering the opinion upon

the facts of that case, LORD THURLOW observed: "The great doubt which I have had from the beginning to the end of this case is, whether the ground upon which I must go, if I affirm this decree, will not by necessary implication extend to many other cases, in which I shall run the hazard of undoing all the common transactions of mankind, and of rendering their dealing insecure." To meet this pregnant suggestion of the Chancellor, the appellee's counsel cites the language of the Court in *Van Epps* v. *Van Epps*, 9 Paige, 241, in which it is said: "The rule is not confined to trustees or others who hold the legal title to the property to be sold, but applies universally to all who come within its principle, which is that no party can be permitted to purchase an interest in property and hold it for his own benefit where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account. The duty to protect the trust fund is the foundation in both cases of the duty in reference to the premises. Identity of security was not essential."

This case was argued for the appellant as if the Glick mortgage instead of being made by Robert C. Read upon his own property, had been made by Wm. J. Read upon his property, and *his* equity of redemption had been a part of the trust estate, and thus it was contended that Mr. Reynolds in purchasing Robert C. Read's property at his own sale, was a trustee buying in trust property. The general rule laid down in *Fox* v. *Mackreth, supra*, is too firmly established to be questioned, but as was said by the Judge in the opinion below in this case, its facts are so radically different from those in any of the numerous cases cited for the plaintiff, that we are unable to see the applicaation of their doctrine to what we are called upon to consider. The plaintiff is bound by the answers as we have said, and under that answer the Glick mortgage was not a debt of the plaintiff, nor did it embrace any property, in any sense a part of, or in anyway connected with the trust estate. If it had been shown to be his debt, it would be a harsh and radical application of the doctrine mentioned, to deny to Mr. Reynolds, under the facts of this case, the right given

him by sec. 15 of Art. 66 of the Code, as assignee of this mortgage, to protect his interest by purchasing the property. That provision of our Code creates, and was designed to create, an exception to the general rule that a trustee cannot buy at his own sale, and is founded upon obviously sound reasons. But it is within the restraining and corrective power of the Court, and whenever it is made to appear that a mortgagee or assignee has used his power oppressively or unfairly to acquire the mortgaged property below its value, such a sale will be set aside.    Even in dealing with the general rule claimed to be applicable and conclusive in this case, our own Court of Appeals, in *Williams* v. *Marshall*, 4 G. & J. 379, said, "there are many exceptions to, or modification of it," and "the trustee will in some cases be protected in his purchase; as if the *cestui que trust* be of full age at the time of sale, and under no disability and with a full knowledge of the transaction, lies by for an unreasonable time,"    *    *    *    and that in equity such sales "are practically treated as voidable only according to circumstances, and as the interest of the *cestui que trust* may require."    As the plaintiff has chosen to present this case to the Court, Mr Reynolds' conduct is absolutely free from reproach or criticism, and conforms to the strictest standard of professional and personal honor, and to the dictates of a kindly and generous heart.    The misfortunes which have swept away the property of Mr. Read are not due to anything done by Mr. Reynolds, or left undone by him, and to set aside this sale would work serious injustice to him, without hope of any benefit either to Mr. Read's creditors or to him.    The appellant urged upon us two cases especially, *Van Epps* v. *Van Epps*, 9 Paige, 241, and *Fulton* v. *Whitney*, 66 N. Y. 559.    In the latter the Court said, "the rule is not confined to trustees, or others, who hold the legal title to the property to be sold, but applies universally to all who come within the principle which is, that no party can be permitted to purchase an interest in any property, and hold it for his own benefit, where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account."

In that case, the testator bequeathed to his executors a fund, in trust, 1st, to pay debts not otherwise provided for; and 2nd, to pay certain legacies. He also left certain real estate encumbered by a mortgage. This was foreclosed, and was bid in by the executors, and their partner, J, who was cognizant of all the facts, for $5,000, though then worth $10,000. The sale left a deficit of $6,500, which, as a debt unprovided for, was paid by the executors out of the trust fund, thereby rendering it insufficient to pay the legacies, and the sale, upon the application of the disappointed legatees, was set aside. In that case, the purchase of the mortgaged premises by the trustees at an inadequate price, had the effect to diminish the trust fund, and brought the trustees within the rule announced therein.

In *Van Epps* v. *Van Epps*, the Chancellor held that the holder in trust of a junior mortgage, owed a duty in case of a foreclosure of a senior mortgage on the same property, to make it produce as much as possible, and that he was therefore precluded from becoming a purchaser at the sale under the first mortgage, and the reason for so holding is the same as in *Fulton* v. *Whitney*. No Court has been more consistent and firm than our own Court of Appeals, in denying to trustees any undue advantages secured in any way through their conduct of the trust, and we have no disposition to relax this rule. But if we concede for the purposes of this case, the extension of the rule in the cases last cited, this case is not brought within that extension, because the trust estate here could not possibly be increased or diminished by any increase or decrease in the price obtained for Robert C. Read's property. This is obvious upon a careful consideration of the situation, and was clearly demonstrated by the illustrations of counsel at the argument, one or two of which we will reproduce.

Suppose the sale under the Glick mortgage had produced $6,000. This would have paid that mortgage in full, but would have left nothing for the White mortgage $8,000, the whole of which would then have been owed by the trust estate.

. Suppose the sale had produced $10,000. This would have paid the Glick mortgage in full and $4,000 on the White mortgage. The trust estate would then have owed the remainining $4,000, and would also have owed Robert C. Read's estate the $4,000 paid by it as surety for Wm. J. Read—the same result as before.

Again suppose it had brought $14,000. This would have paid both mortgages in full. But the trust estate would then owe Robert C. Read's estate, the whole $8,000, paid by it as surety for Wm. J. Read—still the same result; and so it would be however the stiuation might be varied.

The fact that Wm. J. Read is now sole heir of Robert C. Read can make no difference, since whatever he might have inherited from him constitutes no part of the trust estate, and cannot be considered by us.

For the reasons stated the decree dismissing the bill must be affirmed.

*Decree affirmed with costs to the appellee above and below.*

(Decided January 19th, 1905.)